1  Pat Lundvall (NVSBN 3761)
2  McDonald Carano LLP
   2300 West Sahara Avenue, Suite 1200
3  Las Vegas, Nevada 89102
   Tel: (702) 873-4100
4  plundvall@mcdonaldcarano.com

5  James V. Masella, III (pending admission *pro hac vice*)
   Jesse A. Townsend (pending admission *pro hac vice*)
6  PATTERSON BELKNAP WEBB & TYLER LLP
   1133 Avenue of the Americas
7  New York, NY 10036-6710
   Tel: (212) 336-2000
8  jmasella@pbwt.com
   jtownsend@pbwt.com
9
10 *Attorneys for Defendants Robert Lee, Steve Roberts, Edward Yew, Brian Morales, and Jon Tondeur*
   *and Nominal Defendant Zoompass Holdings, Inc.*

11
                    **UNITED STATES DISTRICT COURT**
12
                        **DISTRICT OF NEVADA**
13

14 AIRICK JOHNSON, Derivatively on behalf of
   Nominal Defendant, ZOOMPASS HOLDINGS
15 INC.,

16                          Plaintiff,              Case No.

17        v.

18 ROBERT LEE, STEVE ROBERTS, EDWARD          **NOTICE OF REMOVAL OF CIVIL**
   YEW, BRIAN MORALES, AND JON                **ACTION**
19 TONDEUR,

20                          Defendants,

21        and

22 ZOOMPASS HOLDINGS, INC.

23                          Nominal
                           Defendant.
24

25

26

27        TO THE CLERK OF THE UNITED STATES DISTRICT COURT OF THE DISTRICT OF

28 NEVADA AND TO PLAINTIFF AND HIS ATTORNEYS OF RECORD:

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §§ 1441 and 1446, Defendants Robert Lee, Steve Roberts, Edward Yew, Brian Morales, and Jon Tondeur (collectively "Defendants") remove to this Court the action described below and respectfully submit the following statement of grounds for removal:

1.      The grounds for this removal is diversity jurisdiction pursuant to 28 U.S.C. § 1332.

2.      All parties consent to removal.

3.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.   Complete diversity exists between Plaintiff and Defendants because (i) Defendants understand that Plaintiff is not a Nevada citizen; (ii) the Individual Defendants are citizens of Canada; and (iii) the Nominal Defendant is incorporated under the laws of the state of Nevada and has its principal place of business at 107 Atlantic Avenue, Suite 201, Toronto, Ontario M6K1Y2. Defendants understand that the amount in controversy exceeds $75,000 because in two other recent federal actions pending against certain of the Individual Defendants and/or Nominal Defendant Zoompass with claims that arise out of the same nucleus of operative facts, the alleged damages exceed $75,000.   *See Kluge v. Lee et al.,* Case No. 2:17-cv-02578-APG-CWH (D. Nev. Oct. 15, 2017); *Patel v. Zoompass Holdings, Inc., et al.,* Case No. 2:17-cv-03831-JLL-JAD (D. NJ May 30, 2017).

4.      This removal notice is timely.  Counsel for Individual Defendants accepted service of the Complaint in this action on November 22, 2017.  This Notice of Removal is timely filed pursuant to 28 U.S.C. §1446(b), as it is within thirty (30) days of that date.  Nominal Defendant Zoompass Holdings, Inc. consents to the removal of this case.

5.      The Complaint was filed on July 26, 2017, thus one year has not elapsed from the date the action in state court commenced.

6.      Venue is proper in the District Court for the District of Nevada pursuant to 28 U.S.C. § 1441(a) because the district embraces the place where the state court action is pending.

7.      Defendants will promptly file a copy of the Notice of Removal with the clerk of the state court.

2

McDONALD ⬧ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

8.      Pursuant to 28 U.S.C. § 1446(a), copies of the pleadings filed in the state court action as of this date are attached hereto as follows: Complaint (Exhibit A) and Stipulation Concerning Service of Process and Staying Proceedings (Exhibit B).

9.      This Notice of Removal is executed and filed pursuant to Fed. R. Civ. P. 11.

WHEREFORE, Defendants remove the above-entitled action now pending in the Eighth Judicial District Court, Clark County, Nevada, Case No. A:17-759099-C, to the United States District Court for the District of Nevada.

Dated:  November 28, 2017.

MCDONALD CARANO, LLP


By: /s/ Pat Lundvall
        Pat Lundvall (NVSBN 3761)
        2300 West Sahara Avenue, Suite 1200
        Las Vegas, Nevada 89102
        Tel: (702) 873-4100
        plundvall@mcdonaldcarano.com


PATTERSON BELKNAP WEBB & TYLER LLP

James V. Masella, III (pending admission *pro hac vice*)
Jesse A. Townsend (pending admission *pro hac vice*)
1133 Avenue of the Americas
New York, New York 10036
Tel: 212-336-2000
jmasella@pbwt.com
jtownsend@pbwt.com

*Attorneys for Defendants Robert Lee, Steve Roberts, Edward Yew, Brian Morales, and Jon Tondeur and for Nominal Defendant Zoompass Holdings, Inc.*

4828-1108-1557, v. 2

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I am an employee of McDonald Carano LLP, and that on the 28th day of November, 2017, I served a true and correct copy of the foregoing NOTICE OF REMOVAL OF CIVIL ACTION via United States Mail as follows:

Patrick R. Leverty, Esq.
Reno Gould House
832 Willow Street
Reno, Nevada 89502

Timothy W. Brown, Esq.
240 Townsend Square
Oyster Bay, New York 11771

/s/ Beau Nelson
An employee of McDonald Carano, LLP

4828-1108-1557, v. 2

# EXHIBIT A

Electronically Filed
7/26/2017 3:03 PM
Steven D. Grierson
CLERK OF THE COURT

COMJD
Timothy W. Brown, Esq.
**THE BROWN LAW FIRM, P.C.**
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

Patrick R. Leverty, Esq.
**LEVERTY & ASSOCIATES LAW CHTD.**
Reno Gould House
832 Willow Street
Reno, NV 89502
Telephone: (775) 322-6636
Facsimile: (775) 322-3953
Email: pat@levertylaw.com

*Counsel for Plaintiff*

IN THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA
IN AND FOR THE COUNTY OF CLARK

| | |
|---|---|
| Airick Johnson, derivatively and on behalf of Zoompass Holdings, Inc.<br><br>Plaintiff,<br><br>vs.<br><br>Robert Lee, Steve Roberts, Edward Yew, Brian Morales, and Jon Tondeur,<br><br>Defendants,<br><br>-and-<br><br>Zoompass Holdings, Inc.<br><br>Nominal Defendant. | CASE No.: A-17-759099-C<br><br>Department No. Department 2<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:**<br><br>(1) BREACH OF FIDUCIARY DUTY;<br>(2) CORPORATE WASTE;<br>(3) GROSS MISMANAGEMENT;<br>(4) UNJUST ENRICHMENT; AND<br>(5) WASTE OF CORPORATE ASSETS<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Airick Johnson ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Zoompass Holdings, Inc. ("Zoompass" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Robert Lee, Steve Roberts, Edward Yew, Brian Morales, and Jon Tondeur (collectively, the "Individual Defendants") for breaches of their

1

Verified Shareholder Derivative Complaint

fiduciary duties as directors and/or officers of Zoompass, unjust enrichment, waste of corporate assets, abuse of control, and gross mismanagement. As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Zoompass, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.  This is a shareholder derivative action that seeks to remedy wrongdoing committed by Zoompass's directors and officers from April 24, 2017 through the present (the "Relevant Period").

2.  Zoompass develops a mobile money platform that enables brands to transform their financial interactions with customers. The Company also provides mobile technology solutions such as direct payroll deposit, international and domestic money transfers, contractor payments, bill payments, and merchant payments.

3.  Zoompass was founded in 2009 and is headquartered in Toronto, Canada. Its common stock trades Over-the-Counter ("OTC") under the ticker symbol "ZPAS." The Company was formerly known as UVIC, Inc., with Zoompass having engaged in a reverse merger with UVIC, Inc. on August 22, 2016.

4.  From at least the beginning of the Relevant Period, Zoompass launched a stock-promotion campaign through Creative Direct Marketing Group ("CDMG") and the website

Verified Shareholder Derivative Complaint

"zoompassinvestor.com." As part of the scheme, the Company wasted corporate assets by paying CDMG almost $2 million through Sargon Finance SA ("Sargon Finance"). The purpose of the stock promotion scheme was to publish and disseminate multiple supposedly independent articles to recommend investments in Zoompass and ultimately raise the price of Zoompass stock.

5.      In a May 9, 2017 Press Release (the "May 9, 2017 Press Release"), Zoompass disclosed that it had been "made aware of and requested by the OTC Markets Group, Inc. ["OTC Markets Group"] to comment on recent trading and potential promotional activity."

6.      On May 11, 2017, Zoompass issued a press release (the "May 11, 2017 Press Release") commenting on the placement of the "Caveat Emptor symbol on the company profile as a result of the promotional activities that was disclosed in our Press Release issued May 9, 2017."

7.      The OTC Markets Group designates certain securities as "Caveat Emptor" to inform investors that there may be reason to exercise additional care and perform thorough due diligence before making an investment decision in that security. The Caveat Emptor symbol is publicly displayed on the OTC Markets Group website and is distributed on market data feeds.

8.      After these announcements, Zoompass shares fell 45%, or $1.67, over three trading days, from $3.64 on May 9, 2017 to close at $1.97 per share on May 12, 2017, on unusually heavy trading volume.

9.      On May 25, 2017, *Seeking Alpha* published an article by the Fraud Research Institute titled: "Zoompass Holdings: Buyer Beware" (the "Seeking Alpha Exposé"). The Seeking Alpha Exposé outlined, *inter alia*, Zoompass's and the Individual Defendants' involvement in a scheme to make hidden payments to stock promoters and to fail to make legally required disclosures, including Defendant Lee's apparent connection to a different company, Pura Naturals, Inc. ("Pura Naturals" or "Pura"), that had also utilized a similar CDMG-connected website to pump its share prices. Additionally, it highlighted issues related to the appearance of the Company's original corporate name

Verified Shareholder Derivative Complaint

in an SEC subpoena related to questionable registration statements and a listing of the Company's stock on OTCMarkets.com ("OTC Markets") as "'Caveat Emptor' aka Buyer Beware."

10.     On this news, the price of Zoompass common stock fell $0.65 per share, or over 23%, to close at $2.25 per share on May 25, 2017, on unusually heavy trading volume.

11.     During the Relevant Period and in breach of their fiduciary duties owed to Zoompass, the Individual Defendants engaged in the following misconduct: (1) engaged in a scheme to manipulate the price and trading volume of Zoompass's stock by paying stock promoters to disseminate false, misleading, and/or exaggerated articles and promotions concerning the Company; (2) concealed that the Company paid stock promoters through an undisclosed entity in violation of federal law; and (3) subjected the Company to potential criminal sanctions and heightened regulatory scrutiny as a result of the discovery of their scheme (collectively, the "Fraudulent Misconduct").

12.     The Individual Defendants also breached their fiduciary duties by failing to maintain adequate internal controls.

13.     Also in breach of their fiduciary duties, the Individual Defendants knowingly or recklessly personally made and/or caused the Company to make false and misleading statements of material fact that failed to disclose: (1) their engagement in the Fraudulent Misconduct; and (2) that they failed to maintain adequate internal controls.  As a result, Defendants' public statements were materially false and misleading at all relevant times, and caused an artificial inflation of Zoompass's stock price.

14.     The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

15.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO")

4

to a federal securities fraud class action lawsuit filed on May 30, 2017 and pending in the United States District Court for the District of New Jersey (the "Securities Class Action"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and will likely cost the Company going forward millions of dollars.

16. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

17. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, and all of whom are dominated by the controlling shareholders and/or who are the controlling shareholders, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of certain of them in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's board of directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

### JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction because Plaintiff's claims arise under Nevada state law.

19. The Court has personal jurisdiction over each of the Individual Defendants because each Individual has sufficient minimum contacts with Nevada so as to render the exercise of jurisdiction by the Nevada courts permissible under traditional notions of fair play and substantial justice. The Company is a Nevada corporation and thus a resident of Nevada.

20. Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred or had an effect in Henderson, where the Company maintains

Verified Shareholder Derivative Complaint

a registered presence, and because the Individual Defendants have engaged in the wrongful conduct alleged in this Complaint in this District.

## PARTIES

### Plaintiff

21.     Plaintiff is a current shareholder of Zoompass common stock. Plaintiff has continuously held Zoompass common stock at all relevant times.

### Nominal Defendant Zoompass

22.     Nominal Defendant Zoompass is a Nevada corporation with its principal executive offices at 107 Atlantic Ave., Suite 201, Toronto, Ontario M6K1Y2.  The Company's registered agent is located at 2360 Corporate Circle, Suite 400, Henderson, Nevada 89074.

23.     Zoompass stock trades Over-the-Counter ("OTC") under the ticker symbol "ZPAS."

### Defendant Lee

24.     Defendant Robert Lee ("Lee") has served as the Company's CEO and as a Company director since August 2016.  According to the Company's Form 10-K for the fiscal year ended December 31, 2016 and filed with the SEC on April 24, 2017 (the "2016 10-K"), as of April 18, 2017, Defendant Lee beneficially owned 15,210,668 shares of the Company's common stock, which was 38.1% of the Company's issued and outstanding common stock.  Defendant Lee is therefore a "significant shareholder" of the Company as stated in the 2016 10-K. Given that the price per share of the Company's common stock at the close of trading on April 18, 2017 was $2.06, Lee owned over $31.3 million worth of Zoompass stock.

25.     For the fiscal year ended December 31, 2016, Defendant Lee received $349,923 in compensation from the Company.  This included $101,312 in salary, $74,131 in deferred stock units, and $174,480 in option awards.

6

26.     The 2016 10-K included a provision regarding Long-Term Incentive Equity Compensation (the "Long-Term Incentive") under which the Company would:

> **provid[e] executive officers with incentives to improve shareholder value and contribute to the success of the Company and by enabling the Company to attract, retain and reward the best available persons for executive officer positions.** The Named Executive Officers were eligible to receive [a] certain number of shares of common stock of the Company. The Company cannot currently determine the number or type of additional awards that may be granted to eligible participants under the long-term incentive equity compensation plan in the future. Such determination will be made from time to time by the Board.

(Emphasis added).

27.     According to the 2016 10-K, in November 2016, the Board approved the adoption of an equity based compensation plan (the "Equity Plan").  Pursuant to the Equity Plan, on December 1, 2016, the Company issued 1,480,000 common stock purchase options to its directors, officer, and employees at an exercise price of $1.50 CAD (about $1.16 USD) of which a total of 562,500 vested immediately and were exercisable for five years from the grant date and of which a total of 917,500 vested gradually over a three-year period from the date of grant and were also exercisable for five years from the grant date (the "Common Stock Options"). Of the Common Stock Options, 537,500 were granted to Defendant Lee, of which 197,222 were exercisable as of December 31, 2016.

28.     The Company's 2016 10-K stated the following about Defendant Lee:

Rob Lee, Director and Chief Executive Officer: Since 2014, Mr. Lee has served as the Chief Executive Officer and Director of a private financial technology company. He has previously served as the President and CEO of various companies including Versatech Group Inc., a company listed on the NASDAQ and Toronto Stock Exchange up until the late 1990's.  Since that time Mr. Lee has focussed on the financing and restructuring of various private entities in a wide variety of industries including manufacturing, construction, mining and retail.

**Defendant Roberts**

29.     Defendant Steve Roberts ("Roberts") has served as the Company's President and as a Company director since August 2016. According to the Company's 2016 10-K, as of April 18, 2017, Defendant Roberts beneficially owned 574,497 shares of the Company's common stock, which was

7

1.4% of the Company's issued and outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on April 18, 2017 was $2.06, Roberts owned over $1.18 million worth of Zoompass stock.

30. For the fiscal year ended December 31, 2016, Defendant Roberts received $284,032 in compensation from the Company. This included $35,421 in salary, $74,131 in deferred stock units, and $174,480 in option awards.

31. The 2016 10-K included a provision regarding the Long-Term Incentive, under which the Company would:

**provid[e] executive officers with incentives to improve shareholder value and contribute to the success of the Company and by enabling the Company to attract, retain and reward the best available persons for executive officer positions.** The Named Executive Officers were eligible to receive [a] certain number of shares of common stock of the Company. The Company cannot currently determine the number or type of additional awards that may be granted to eligible participants under the long-term incentive equity compensation plan in the future. Such determination will be made from time to time by the Board.

(Emphasis added).

32. Of the Common Stock Options, 537,500 were granted to Defendant Roberts, of which 197,222 were exercisable as of December 31, 2016.

33. The Company's 2016 10-K stated the following about Defendant Roberts:

Steve Roberts, Director and President: Mr. Roberts most recently served as Vice President, Mobility for Ingram Micro Canada, leading a team focussed on building and growing Ingram Micro's Canadian mobility market share and partnerships. He was responsible for overseeing and executing on Ingram Micro's overall strategic business plan for mobility in Canada, identifying and creating new greenfield growth opportunities, and securing and maintaining a leadership position for Ingram Micro in the Canadian mobility marketplace. With almost 30 years of experience in the telecommunications industry, Mr. Roberts has previously held senior positions with Fortune 500 companies Bell Mobility and Rogers Communications, where he served as the company's regional president in Ontario. In 2009, he was appointed to the CEO's Round Table at Rogers Communications, becoming part of a team of 40 top executives who helped develop strategy and direction for the telecom giant. Before joining Ingram Micro in 2014, Mr. Roberts held positions as President, Global Operations for Polar Wireless, a new telecom company developing state-of-the-art technology to eliminate roaming fees for international travelers, and as CEO, Global Operations for U.S.-based

Verified Shareholder Derivative Complaint

Forum Telecom. Roberts graduated from the University of Guelph with a double major in business management and economics, and completed the Ivey Executive Program.

**Defendant Yew**

34. Defendant Edward Yew ("Yew") has served as the Company's Secretary and as a Company director since August 2016. According to the Company's 2016 10-K, as of April 18, 2017, Defendant Yew beneficially owned 4,875,997 shares of the Company's common stock, which was 12.2% of the Company's issued and outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on April 18, 2017 was $2.06, Yew owned over $10 million worth of Zoompass stock.

35. For the fiscal year ended December 31, 2016, Defendant Yew received $53,165 in salary compensation from the Company.

36. The 2016 10-K included a provision regarding the Long-Term Incentive, under which the Company would:

> **provid[e] executive officers with incentives to improve shareholder value and contribute to the success of the Company and by enabling the Company to attract, retain and reward the best available persons for executive officer positions.** The Named Executive Officers were eligible to receive [a] certain number of shares of common stock of the Company. The Company cannot currently determine the number or type of additional awards that may be granted to eligible participants under the long-term incentive equity compensation plan in the future. Such determination will be made from time to time by the Board.

(Emphasis added).

37. The Company's 2016 10-K stated the following about Defendant Yew:

> Edward (Ted) Yew, Director and Secretary: Mr. Yew began his finance career at Credit Suisse Securities as an Equity Analyst and complemented his capital markets experience at three other boutique investment banking firms at various roles including Investment Banking, Compliance, and as a Fund Manager. Most recently, he has served as the CEO of a public mining company trading on the TSX and Frankfurt Stock Exchange. Mr. Yew earned an Electrical Engineering Degree from The University of Western Ontario and an MBA from Joseph L. Rotman, University of Toronto.

**Defendant Morales**

9

38.     Defendant Brian Morales ("Morales") has been the CFO of the Company since August 2016. For the fiscal year ended December 31, 2016, Defendant Morales received $45,646 in compensation from the Company.  This included $39,802 in salary, $1,751 in deferred stock units, and $4,093 in option awards.

39.     The 2016 10-K included a provision regarding the Long-Term Incentive, under which the Company would:

> **provid[e] executive officers with incentives to improve shareholder value and contribute to the success of the Company and by enabling the Company to attract, retain and reward the best available persons for executive officer positions.** The Named Executive Officers were eligible to receive [a] certain number of shares of common stock of the Company. The Company cannot currently determine the number or type of additional awards that may be granted to eligible participants under the long-term incentive equity compensation plan in the future. Such determination will be made from time to time by the Board.

(Emphasis added).

40.     Of the Common Stock Options, 168,750 were granted to Defendant Morales, of which 4,688 were exercisable as of December 31, 2016.

41.     The Company's 2016 10-K stated the following about Defendant Morales:

> Brian Morales, Chief Financial Officer:  Mr. Morales is a CPA, CA and has most recently served as Chief Financial Officer and Corporate secretary of several publicly listed mining exploration development companies from 2010 to 2016, including companies which are or were listed on the TSX Venture Exchange, the Toronto Stock Exchange, the OTCQX and the AIM.  Mr. Morales previously held a finance position with Kinross Gold Corporation from 2008 to 2010 and was employed in equity research with Credit Suisse Securities (Canada) Inc., covering the precious metals sector, from 2007 to 2008.  Mr. Morales obtained his CA in 2004 and graduated with a BBA from the Schulich School of Business at York University in 2001.

**Defendant Tondeur**

42.     Defendant Jon Tondeur ("Tondeur") has been a Director of the Company since August 2016. According to the Company's 2016 10-K, as of April 18, 2017, Defendant Tondeur beneficially owned 1,279,999 shares of the Company's common stock, which was 3.2% of the Company's issued and outstanding common stock.  Given that the price per share of the Company's common stock at

10

the close of trading on April 18, 2017 was $2.06, Tondeur owned over $2.63 million worth of Zoompass stock.

43.    For the fiscal year ended December 31, 2016, Defendant Tondeur received $237,009 in compensation from the Company. This included $71,108 in deferred stock units and $165,991 in option awards.

44.    Of the Common Stock Options, 187,500 were granted to Defendant Tondeur, all of which were exercisable as of December 31, 2016.

45.    According to the 2016 10-K, on November 30, 2016, Defendant Tondeur also received 400,000 common share purchase warrants with an exercise price of $0.50 CAD (about $0.39 USD) that were exercisable into one common share of the Company until October 31, 2017.

46.    The Company's 2016 10-K stated the following about Defendant Tondeur:

Jon Tondeur, Director: Mr. Tondeur graduated from the School of Engineering at the University of Guelph in 1985. Until recently, Mr. Tondeur was a senior partner with Stevenson & Hunt Insurance, and was a driving force in growing the firm into one of Canada's largest insurance brokerages. Mr. Tondeur's clientele and area of expertise is primarily in the construction sector, whereby he manages the bonding and insurance requirements for some of the largest contracting firms in Canada. His business intelligence is currently focused on industry diversification and investment. Mr. Tondeur currently serves as a director of Rockex Mining Corporation.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

47.    By reason of their positions as officers, directors and/or fiduciaries of Zoompass and because of their ability to control the business and corporate affairs of Zoompass, the Individual Defendants owed Zoompass and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Zoompass in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Zoompass and its shareholders so as to benefit all shareholders equally.

48.     Each director and officer of the Company owes to Zoompass and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

49.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Zoompass, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

50.     To discharge their duties, the officers and directors of Zoompass were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

51.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Zoompass, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the Individual Defendants who collectively comprised Zoompass's Board at all relevant times.

52.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 ("Exchange Act") and traded on OTC, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products,

management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose all those facts alleged in this complaint that the Company failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

53.    To discharge their duties, the officers and directors of Zoompass were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Zoompass were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada, the United States, and Canada;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Zoompass conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Zoompass and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause an independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Zoompass's operations would comply with all laws and Zoompass's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

Verified Shareholder Derivative Complaint

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

54.    Each of the Individual Defendants further owed to Zoompass and the shareholders the duty of loyalty requiring that each favor Zoompass's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

55.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Zoompass and were at all times acting within the course and scope of such agency.

56.    Because of their advisory, executive, managerial, and directorial positions with Zoompass, each of the Individual Defendants had access to adverse, non-public information about the Company.

57.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Zoompass.

Verified Shareholder Derivative Complaint

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

58.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein, as well as aided and abetted and/or assisted each other in breaching their respective duties.

59.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) conceal adverse information concerning the Company's operations, financial condition, competitors, future business prospects, internal controls, and the Company's engagement in the Fraudulent Misconduct; (iii) artificially inflate the Company's stock price; and (iv) engage in the Fraudulent Misconduct.

60.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Zoompass was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

61.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

62.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Zoompass, and was at all times acting within the course and scope of such agency.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### The Federal Securities Laws on Stock Promotion

63.     The Individual Defendants' failure to disclose Zoompass's paid relationships with a stock promoter ran afoul of Section 17(b) of the Securities Act of 1933.

64.     Section 17(b) – commonly known as the "anti-touting" provision – provides, in pertinent part, that anyone who advertises a stock, even if he does not purport to offer the security for sale, must disclose the "consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, the receipt, whether past or prospective, of such consideration and the amount thereof." 15 U.S.C. §77q(b).

65.     This anti-touting provision was enacted, in part, to "meet the evils of the 'tipster sheet' as well as articles in newspapers or periodicals that purport to give an unbiased opinion but which opinions in reality are bought and paid for."[1]

66.     In an investor bulletin published by the SEC titled "Microcap Stock: A Guide for Investors," the SEC provides information about investment in microcap stocks and specifically warns of potential fraud, explaining as follows:

> Paid Promoters: Some microcap companies pay stock promoters to recommend or "tout" the microcap stock in supposedly independent and unbiased investment newsletters, research reports, or radio and television shows . . . . The federal securities laws require the publications to disclose who paid them for the promotion, the amount, and the type of payment. ***But many fraudsters fail to do so and mislead investors into believing they are receiving independent advice.***

(Emphasis added.)

---

[1] *SEC v. Wall St. Pub. Inst., Inc.*, 851 F.2d 365, 376 (D.C. Cir. 1988) (quoting House Committee Report, H.R. Rep. No. 85, 73d Cong., 1st Sess. 6 (1933)).

Verified Shareholder Derivative Complaint

This SEC investor bulletin may be found at http://www.sec.gov/investor/pubs/microcapstock.htm.

67.     Moreover, an issuer of securities is also required to disclose the details of its relationship with a stock promoter in its regulatory filings.  Here, Defendants' failure to disclose the stock promoter's receipt of compensation directly or indirectly from the Company for making material statements concerning Zoompass is a material omission and thus a violation of the Exchange Act.

**The Fraudulent Misconduct**

68.     Zoompass and the Individual Defendants were involved in a scheme during the Relevant Period to make hidden payments to stock promoters in order to pump up the prices of Zoompass stock, defrauding investors. The Company's stock promotion scheme is connected to CDMG, an advertising and digital marketing agency located in Southern California, which runs the website Zoompassinvestor.com (the "Zoompass Promotional Website").

69.     The stock promoters touted Zoompass stock through the Zoompass Promotional Website, which asserted in its disclaimer that it was "an independent paid circulation newsletter." Present throughout the Zoompass Promotional Website is a hackneyed promotion of Zoompass stock written by Editor Rick Currin ("Currin"), which "is quick to point out industry statistics and million dollar figures relating to 'financial technology' while lacking substance relating to the company's internal business operations." *See* Seeking Alpha Exposé.

70.     The Zoompass Promotional Website's disclaimer contains the fact that Sargon Finance, a third-party company, paid nearly $2 million "for the creation of various elements of this campaign in an effort to build investor awareness" of Zoompass.

71.     Notably, the Seeking Alpha Exposé linked Zoompass to another heavily promoted stock, Pura Naturals, which used a nearly identical promotion campaign to Zoompass's, including a similar CDMG-connected website to pump its share prices.

Verified Shareholder Derivative Complaint

72.     Pura's connection to Zoompass is via Defendant Lee, who is upon information and belief the CEO of Pura, listed as "Robert Doherty," and who is also listed on Zoompass's 2016 10-K as the Company's Director and Chief Executive Officer. *See* Seeking Alpha Exposé. Additionally, a reference to "Robert Lee" was made in a Pura Form 8-K filed on July 26, 2016. This "smoking gun" revelation regarding the connection between Zoompass and Pura only emphasizes the fact that Defendant Lee, and all of the Individual Defendants, were involved in promulgating a promotional scheme that was in breach of their fiduciary duties to investors.

73.     The similarities between the CDMG-connected promotional websites of Zoompass and Pura, in addition to the fact that the CEO of both companies is upon information and belief Defendant Lee, underline the fact that the Zoompass Promotional Website was actually funded by Zoompass itself, not a third party. *See* Seeking Alpha Exposé. Although the disclaimer stated that the promotion was paid for by Sargon Finance, the promotion failed to disclose that it was actually paid for indirectly by the Company and not, as it claimed, by "an independent paid circulation newsletter."

74.     Further connections between Zoompass and Pura were revealed by the Seeking Alpha Exposé, including the fact that the press releases denying involvement in a stock promotion scheme by Zoompass and Pura on May 9, 2017 and January 19, 2017, respectively, were "almost identical in context with some areas copied verbatim," indicating "either plagiarism or a related party being responsible for the authoring of both companies' press releases." *See* Seeking Alpha Exposé. The article also concluded that "[b]ased on all of our other findings, we believe the likelihood of the latter is very high."

75.     On May 11, 2017, as a result of the Fraudulent Misconduct, the Company's stock was flagged on OTC Markets as "'Caveat Emptor' aka Buyer Beware." The placement of a "Caveat Emptor" designation on the Zoompass listing was also partially a result of issues related to the

Verified Shareholder Derivative Complaint

appearance of the Company's original corporate name in an SEC subpoena related to questionable registration statements. *See* Seeking Alpha Exposé.

76.     The OTC Markets Group designates certain securities as "Caveat Emptor" to inform investors that there may be reason to exercise additional care and perform thorough due diligence before making an investment decision in that security.   The Caveat Emptor symbol is publicly displayed on the OTC Markets Group website and is distributed on market data feeds.

77.     The Individual Defendants breached their fiduciary duties by engaging in the Fraudulent Misconduct, which included causing stock promoters to publish false and misleading promotions about the Company that failed to disclose that they were actually paid for by Zoompass.

78.     Following the publication of the Seeking Alpha Exposé, the price of Zoompass common stock fell $0.65 per share, or over 23%, to close at $2.25 per share on May 25, 2017, on unusually heavy trading volume.

**False and Misleading Statements**

**April 24, 2017 Form 10-K**

79.     The Relevant Period begins on April 24, 2017 with the Company's filing of the 2016 10-K, which was signed by Defendants Lee, Morales, and Tondeur, the latter of whom signed on behalf of the Board, and which announced the Company's financial and operating results for the fiscal quarter and year ended December 31, 2016.  However, in the 2016 10-K, the Individual Defendants failed to disclose: (1) their engagement in the Fraudulent Misconduct; and (2) that they failed to maintain adequate internal controls. The 2016 10-K not only failed to disclose the Fraudulent Misconduct, but affirmatively made a false and misleading statement by indicating that the Company did not have any promoters during the past five fiscal years, despite the fact that they were currently engaging in a paid stock promotion scheme.

Verified Shareholder Derivative Complaint

80.     Attached to the 2016 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) of the Exchange Act, Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX"), and 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sox, ("SOX Certifications"), signed by Defendants Lee and Morales, attesting to the accuracy of the 2016 10-K.  The SOX Certifications also attested that the 2016 10-K disclosed any material changes to the Company's internal control over financial reporting. These certifications also represented that the 2016 10-K was a full disclosure, "in all material aspects, the financial condition and results of operations of Zoompass Holdings, Inc." This statement was false or misleading because of the Defendants Lee's and Morales's awareness of the Fraudulent Misconduct.  The 2016 10-K stated, in relevant part:

> Our management, with the supervision and participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act"). Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of December 31, 2016, were effective such that the information required to be disclosed by us in reports filed under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to our management to allow timely decisions regarding disclosure. A controls system cannot provide absolute assurance, however, that the objectives of the controls system are met, and no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected.

> ***

> **Promoters and Certain Control Persons**

> **We did not have any promoters at any time during the past five fiscal years.**
> Our executive officers and directors from time to time may serve on the board of directors executive officers of other companies. However, none of our executive officer or directors serve as executive officers or directors or on the compensation committee of another company that has any executive officer serving on our Board of Directors (or Board of Directors acting as the Compensation Committee).

> No person who served on our Board of Directors (or Board of Directors acting as the Compensation Committee) had any relationship requiring disclosure under Item 404 of Regulation S-K.

(Emphasis added).

**May 9, 2017 Press Release**

81.     On May 9, 2017, Zoompass issued the May 9, 2017 Press Release, commenting "on recent trading and potential promotional activity concerning ZPAS common stock." In the May 9, 2017 Press Release, however, the Individual Defendants failed to disclose: (1) their engagement in the Fraudulent Misconduct; and (2) that they failed to maintain adequate internal controls. Moreover, the Individual Defendants made an affirmatively false and misleading representation in not only failing to disclose the Fraudulent Misconduct, but also in denying the stock promotion scheme's existence despite knowledge of the Company's engagement in the Fraudulent Misconduct. Thus, the press release provided a false and misleading portrayal of the Company's involvement in the scheme when it stated that the Company was "unaware of the full nature and content of the promotional newsletter and any related promotional activity" and that the Individual Defendants "definitively" were "not . . . involved in any way."

82.     The May 9, 2017 Press Release stated, in relevant part:

On May 8, 2017, OTC Markets informed the Company that it became aware of a promotional newsletter touting the Company and encouraging investors to purchase the Company's common stock. The Company is unaware of the effect on the trading activity, if any, as the Company had previously issued over the preceding several weeks press releases and SEC reports outlining, among other things, more complete and robust descriptions of the Company's business and opportunities, the entry into certain agreements in furtherance of the Company's disclosed business plans, and consummation of private placements with respect to the sale of non-registered shares in the common stock of the Company necessary to effect the business plan. During which time the Company's common stock, and volume of trading, rose at a steady and robust rate. Following the Company's forward stock split approved in mid-February of this year, the public announcements thereof shortly thereafter, and DWAC approval from the DTC in the middle of March, the Company's stock began trading actively in late-March. **The Company is unaware of the full nature and content of the promotional newsletter and any related promotional activity, the responsible parties and the extent of the email newsletters' dissemination.**

**The Company is not aware of the promotional materials' author or its affiliated entities or persons, other than the identifying information disclosed in the newsletter. The Company's recent press releases have reported on and provided disclosure of legitimate and ongoing corporate activity only, and are not part of any promotional activities or campaign.** "While we support the rights of investors and market participants to publicly comment on our stock and the market generally, the Company encourages those interested in the Company to rely solely on information included in its press releases combined with its filings and disclosures made with

21

OTCMarkets Group and the Securities and Exchange Commission, which is available on the SEC's website. We thank OTCMarkets for their openness and consideration to the investors of Zoompass Holdings, Inc. and will continue to support the open and complete disclosure of information regarding the Company" commented Mr. Brian Morales, Chief Financial Officer of the Company.

**After inquiry, the Company states definitively that its officers, directors and, to the Company's knowledge, its controlling shareholders (i.e., shareholders owning 10% or more of the Company's securities), of which there are only two, have not, directly or indirectly, authorized or been involved in any way (including payment to a third-party) with the creation or distribution of promotional materials including the subject newsletter**;

***

Despite a statement in the promotional material that the author has spoken to management of the Company, the Officers, Directors and the controlling shareholders definitively state that there has been no contact with the author of the material.

(Emphasis added.)

83.    Following the May 9, 2017 Press Release, Zoompass shares fell 45%, or $1.67, over three trading days, from $3.64 on May 9, 2017 to close at $1.97 per share on May 12, 2017 on unusually heavy trading volume.

**May 11, 2017 Press Release**

84.    On May 11, 2017, Zoompass issued the May 11, 2017 Press Release, commenting on the placement of the "Caveat Emptor symbol on the company profile as a result of the promotional activities that was disclosed in our Press Release issued May 9, 2017." In the May 11, 2017 Press Release, however, the Individual Defendants failed to disclose: (1) their engagement in the Fraudulent Misconduct; and (2) that they failed to maintain adequate internal controls. Moreover, the Individual Defendants again made an affirmatively false and misleading representation by denying the stock promotion scheme's existence despite knowledge of the Company's engagement in the Fraudulent Misconduct. Thus, the press release provided a false and misleading portrayal of the Company's involvement in the scheme when it stated that the Company "assure[d] the public that all of [its] press releases, SEC filings and information on [its] website . . . and the OTC markets profile remains true, correct and complete."

Verified Shareholder Derivative Complaint

85.    The May 11, 2017 Press Release stated, in relevant part:

As a matter of policy, when it has come to the attention of OTC Markets that a security has been the subject of promotional activities, OTC Markets may at its discretion label a security "Caveat Emptor." Promotional activities may include newsletters, whether they are published by the company or a third party, as was the case here. **We note that the Caveat Emptor sign does not mean or imply that any public information made available by the Company is inaccurate, incomplete or insufficient in any way, and is not an opinion or suggestion by the OTC Markets or the Company regarding the price of the Company's common stock. We assure the public that all of our press releases, SEC filings and information on our website (www.zoompass.com) and the OTC markets profile remains true, correct and complete.**

\*\*\*

"The Company supports the OTC Markets' policy regarding promotional activities," stated Rob Lee, Chief Executive Officer of Zoompass Holdings, Inc., "but **we also strongly believe that our public disclosures are accurate and complete, and that they fully describe our commitment to our business plan and our progress in effectuating our business plan. We believe that any increased market interest in our securities in recent weeks is the result of those efforts and disclosures, and not materially related to any newsletters that may have been distributed by third parties.**"

(Emphasis added.)

86.    Following the May 11, 2017 Press Release, Zoompass shares fell 16%, or $0.37, from $2.34 on May 11, 2017 to close at $1.97 per share on May 12, 2017 on unusually heavy trading volume.

**May 15, 2017 Form 10-Q**

87.    On May 15, 2017, the Company filed a quarterly report for the fiscal period ended March 31, 2017 on Form 10-Q with the SEC, (the "1Q 2017 10-Q"), signed by Defendant Lee.  In the 1Q 2017 10-Q, the Individual Defendants failed to disclose: (1) their engagement in the Fraudulent Misconduct; and (2) that they failed to maintain adequate internal controls.  The failure to disclose was false or misleading because of Individual Defendants' awareness of their Fraudulent Misconduct.

88.    The 1Q 2017 10-Q instead stated, as to its "Evaluation of Disclosure Controls and Procedures," that:

The Company maintains "disclosure controls and procedures" as such term is defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act, that are designed to

23

ensure that information required to be disclosed by the Company in reports that are filed or submitted under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in SEC rules and forms, and such information is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate, to allow timely decisions regarding required disclosure.

As of the end of the period covered by this Quarterly Report, the Company carried out an evaluation, under the supervision and with the participation of our chief executive officer and chief financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Exchange Act Rules 13a-15(b) and 15d-15(b). Based upon this evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures as of the end of the period covered by this Quarterly Report were ineffective due to a lack of segregation of duties, due to limited administrative and financial personnel and related resources and as only one of our directors is independent segregation of duties as well as lack of administrative and financial personnel and related resources.

89.     The 1Q 2017 10-Q also contained SOX certifications signed by Defendants Lee and Morales, attesting to the accuracy of the 1Q 2017 10-Q. The SOX Certifications also attested that the 1Q 2017 10-Q disclosed any material changes to the Company's internal control over financial reporting, and represented that the 1Q 2017 10-Q was a full disclosure, "in all material aspects, the financial condition and results of operations of Zoompass Holdings, Inc. This statement was false or misleading because of the Defendants Lee's and Morales's awareness of the Individual Defendants' Fraudulent Misconduct.

**The May 25, 2017 Seeking Alpha Exposé**

90.     Released on May 25, 2017, the Seeking Alpha Exposé outlined Zoompass and the Individual Defendants' involvement in a scheme to make hidden payments to stock promoters to pump up the price of Zoompass stock. For the first time, the Seeking Alpha Exposé made the Company's shareholders aware of the true extent of the Fraudulent Misconduct. The Seeking Alpha Exposé also outlined Zoompass's failure to make legally required disclosures including Defendant Lee's apparent connection to Pura Natural, that had also utilized a similar CDMG-connected website to pump its share prices. Moreover, it highlighted issues related to the appearance of the Company's original corporate

24

name in an SEC subpoena related to questionable registration statements and a listing of the Company's stock on OTC Markets as "'Caveat Emptor' aka Buyer Beware." The article summarized and listed some of its key findings and supporting evidence, in relevant part:

**Summary**

- Shares are inflated due in part to an ongoing stock promotion campaign that may end soon
- The company's original corporate name appears in an SEC subpoena related to questionable registration statements.
- OTCMarkets.com has already designated the stock as "Caveat Emptor" aka Buyer Beware.
- The company's CEO has failed to disclose his relationship with another promoted penny stock.

Zoompass Holdings, Inc. (OTCPK:ZPAS) has been one of the top performing and most actively traded micro-cap stocks of 2017. During the past several months, shares of Zoompass have gone from almost complete dormancy to trading millions of shares while increasing in share price by as much as 150%.

However, we believe that the recent move in share price is completely unwarranted and is related to an ongoing stock promotion campaign whereby an advertising budget of nearly $2 million is being spent on a promotional newsletter "touting the Company and encouraging investors to purchase the Company's common stock," as described in a recent press release.

The company was recently designed as "Caveat Emptor" on OTCMarkets.com and its former name, UVIC, Inc., appears in a subpoena issued by the Securities and Exchange Commission related to a number of questionable S-1 registration statements issued by prohibited attorney Adam S. Tracy.

**ZPAS** **Zoompass Holdings, Inc.** 

Common Stock                                                    Current Information

> Buyer Beware. There is a public interest concern associated with the company, which may include a spam campaign, questionable stock promotion, known investigation of fraudulent activity committed by the company or insiders, regulatory suspensions, or disruptive corporate actions.

For all of the reasons outlined in this report, we believe that shares of Zoompass could fall by at least 56% in the short term.

91.     The Seeking Alpha Exposé cast doubt on the recent increase in Zoompass's market cap to nearly $117 million, citing press releases by the Company immediately prior to and during the Relevant Period in arguing that "the main contributor to the stock's recent performance is not the company's recent results but rather an ongoing stock promotion campaign." The Seeking Alpha Exposé thus stated further, in relevant part:

Below we have listed all of the company's announcements made during the past several months. In our opinion, although these press releases occasionally sound upbeat, they fail to reference any specific material numbers that could justify the recent increase in market cap to nearly $117 million:

• Zoompass Virtual Card Program Enables Latin American (LATAM) Consumers Access To US E-Commerce Markets - 5/24/2017

• Zoompass Files First Quarter Results - 5/15/2017

• Zoompass Issues Statement About Its Common Stock OTC Market Listing - 5/11/2017

• Zoompass Issues Statement About Promotional Activity Concerning Its Common Stock - 5/9/2017

• Zoompass Announces Corporate Update - 5/8/2017

• Zoompass Selects UVend Group of Companies as Self Serve Kiosk and Digital Partner - 4/27/2017

• Zoompass Corporate Update - 4/18/2017

• Zoompass Provides Operational and Corporate Update - 3/3/2017

In our opinion, the company's press releases above lack substance. For example, in the company's operational and corporate update, it referenced agreements with SYNNEX Canada Limited, SKY Devices LLC and U-Vend Group, but failed to mention specific terms and conditions.

92.     The Seeking Alpha Exposé also revealed that the Company's stock promotion scheme was connected to CDMG, which runs the Zoompass Promotional Website. The Zoompass Promotional Website contains a report by Currin that "is quick to point out industry statistics and million dollar figures relating to 'financial technology' while lacking substance relating to the company's internal business operations." The Zoompass Promotional Website's disclaimer states that Sargon Finance

26

paid nearly $2 million "for the creation of various elements of this campaign in an effort to build investor awareness" of Zoompass. Although the disclaimer stated that the promotion was paid for by Sargon Finance, the promotion failed to disclose that it was actually paid for indirectly by the Company. The disclaimer further falsely asserted that the Zoompass Promotional Website is "an independent paid circulation newsletter." The relevant portion of the Seeking Alpha Exposé is as follows:

**Volatility Attributed To Stock Promotion**

To date, we have discovered advertisements on Google and Yahoo Finance that direct visitors to a website promoting Zoompass here.

In true promotional form, the website features a glaring report by Editor Rick Currin that is quick to point out industry statistics and million dollar figures relating to "financial technology" while lacking substance relating to the company's internal business operations.

However, the most important dollar amount is buried within the legal disclaimer:

> This online report is a solicitation for subscriptions for the newsletter and a paid promotional advertisement of Zoompass (ZPAS). Zoompass (ZPAS) was chosen to be profiled after Currin Technology completed due diligence on Zoompass (ZPAS). Currin Technology expects to generate new subscriber revenue, the amount of which is unknown at this time, resulting from the distribution of this report. While receiving no direct compensation, and maintaining absolutely no obligation to provide any future views in support of the company highlighted, Currin Technology will receive indirect marketing support consistent with distribution of the report and will likely acquire new subscribers, the amount of which is not known at this time. Sargon Finance SA paid One Million Nine Hundred Ninety-Eight Thousand Two Hundred Sixty Dollars for the creation of various elements of this campaign in an effort to build investor awareness.

The website is actually a tout sheet whereby a third party (Sargon Finance SA) paid almost $2 million "to build investor awareness," or in other words to promote shares of the ZPAS stock to unsuspecting buyers.

It is our opinion that the recent run-up in Zoompass is primarily attributed to this nearly $2 million stock promotion campaign. As we have described in past reports, shares of heavily promoted stocks like Zoompass are temporarily inflated during the promotional campaign and almost always crash in the short term.

Verified Shareholder Derivative Complaint

93.     The connection between Zoompass and CDMG is emphasized by the Seeking Alpha Exposé's revelation that the Zoompass Promotional Website was "nearly identical" in form and content to a stock promotion website for Pura Naturals, which similarly had an advertising budget of just under $2 million and was managed by CDMG. Notably, both Zoompass and Pura put out similar press releases on May 9, 2017 and January 19, 2017 denying involvement in the stock promotion scheme. Additionally, the Seeking Alpha Exposé revealed that Zoompass and Pura had similar stock performance following their promotion on their CDMG-managed promotional websites. The relevant portion of the Seeking Alpha Exposé is as follows:

> We have found the smoking gun evidence linking Zoompass to another heavily promoted stock, Pura Naturals, Inc. (OTCQB:PNAT), and believe that the two stocks will behave similarly. Specifically, we believe that shares of ZPAS will decline by 50-70% from prevailing market prices similar to the way Pura Naturals traded when its stock promotion campaign topped out.

**Zoompass & Pura Naturals: Nearly Identical Promotional Campaigns**

> Zoompass and Pura Naturals have been the subject to promotional campaigns that are so similar in nature that we believe it is not unreasonable to anticipate the two stocks behaving similarly, at least in the short term. For Zoompass, this could mean a sharp decline of more than 50% in the short term.

> Below we have outlined three of the most brazen similarities between the two stock promotion campaigns:

> *1. Creative Direct Marketing Group*

> Creative Direct Marketing Group is an advertising and digital marketing agency located in Southern California that appears to be at least partially responsible for the investor awareness ad campaigns targeting both Zoompass Holdings, Inc. and Pura Naturals, Inc.

> In addition to the similar website layouts and domain names used for both the Zoompass stock promotion (Zoompassinvestor.com) and Pura Naturals stock promotion (Purainvestor.com), you can find direct evidence connecting Creative Direct Marketing Group to both stock promotion advertisements.

> When you sign up to receive Rick Currin's email newsletter from the Zoompass promotional website, you will notice the originating sender of Rick Currin's email alerts is "mkt@theinvestmentstrategy":

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Rick Currin <mkt@theinvestmentstrategy.com> Unsubscribe                    Apr 28
to me

## Zoompass' (OTC: ZPAS) Disruptive Mobile Technology Could Help You Turn Every $5,000 Invested into $18,475 – or More!

A search of ICANN's WHOIS database reveals that the owner of the "theinvestmentstrategy.com" domain name is Craig Huey, president of the Creative Direct Marketing Group:

*Showing results for: THEINVESTMENTSTRATEGY.COM*
Original Query: theinvestmentstrategy.com

## Contact Information

| Registrant Contact | Admin Contact | Tech Contact |
| --- | --- | --- |
| Name: CRAIG HUEY | Name: CRAIG HUEY | Name: CRAIG HUEY |
| Organization: CDMG INC. | Organization: CDMG INC. | Organization: CDMG INC. |
| Mailing Address: 21171 S WESTERN AVE, TORRANCE CA 90501 US | Mailing Address: 21171 S WESTERN AVE, TORRANCE CA 90501 US | Mailing Address: 21171 S WESTERN AVE, TORRANCE CA 90501 US |
| Phone: +1.3102125727 | Phone: +1.3102125727 | Phone: +1.3102125727 |
| Ext: | Ext: | Ext: |
| Fax: | Fax: | Fax: |
| Fax Ext: | Fax Ext: | Fax Ext: |
| Email:ACCOUNTING@CDMGINC.COM | Email:ACCOUNTING@CDMGINC.COM | Email:ACCOUNTING@CDMGINC.COM |

Creative Direct Marketing Group actually won an award for "Best Investor Relations Online Campaign" for its work with Pura Naturals, Inc. and the ad agency is referenced in the legal disclaimer of the PNAT promotional website:

The principal owner of World Opportunity Investor, James DiGeorgia, received a $7,500 due diligence fee to analyze and evaluate Pura Naturals, Inc. (NASDAQ OTC: PNAT) and $25,000 spokesperson and editorial fee. Creative Direct Marketing Group, Inc. participated in the creation and dissemination of these materials. This report does not provide a professional analysis of a Pura Naturals, Inc. (NASDAQ OTC: PNAT) financial position.

Coincidentally, both Zoompass Holdings and Pura Naturals were subject to stock promotion campaigns with budgets just shy of $2 million managed at least in party by Creative Direct Marketing Group.

Verified Shareholder Derivative Complaint

94.     The Seeking Alpha Exposé went on to detail the fact that Zoompass denied its involvement in the promotion scheme in the May 9, 2017 Press Release. Zoompass's May 9, 2017 Press Release was then compared to a similar press release issued by Pura on January 19, 2017 responding to its own involvement in a stock promotion scheme. The similarities between the two press releases was attributed to the fact that a related party authored both press releases. The Seeking Alpha Exposé stated, in relevant part, as follows:

*2. The Denial of Involvement*

On May 9, 2017, Zoompass issued a press release regarding a promotional newsletter touting the company's stock. Compare Zoompass's press release with the one issued by Pura Naturals on January 19, 2017:

- Zoompass Issues Statement About Promotional Activity Concerning Its Common Stock

- Pura Naturals, Inc. Issues Statement About Promotional Activity Concerning Its Common Stock

The two company-issued press releases above have many sections that are almost identical in context with some areas copied verbatim. The two most likely explanations for these similar press releases is either plagiarism or a related party being responsible for the authoring of both companies' press releases. Based on all of our other findings, we believe the likelihood of the latter is very high.

95.     The Seeking Alpha Exposé also noted the similarities of the stock performance for both Zoompass and Pura following their stock promotion schemes, concluding from their parallel performance that the Zoompass stock's price uptick was driven by the stock promotion scheme and that it was in danger of "imminent collapse." The Seeking Alpha Exposé thus stated in relevant part:

*3. The Chart Patterns*

Below is a historical stock chart for Pura Naturals, Inc. for the relevant time period when its stock was subjected to a promotion campaign.

Verified Shareholder Derivative Complaint



Compare the chart above with the current stock chart for Zoompass and you will notice that to date the charts are nearly identical.

Both stocks were dormant for months and traded at approximately $1.50 per share. Then, all of a sudden, each stock's volume spiked right around the time when promotional newsletter campaigns began surfacing on the Internet. After each stock climbed for about 25 trading days, share prices hit $3.75 and $3.64, respectively. Next, both stocks plummeted by more than 50% before bouncing.

Pura Naturals shares bounced all the way back to $3.45 but failed to break out to new all-time highs. In the 20 trading days that followed, the stock fell by as much as 56%. Although in the long term each company's stock will be more reflective of the successes or failures of each operating business, in the short term, it is our opinion that the stock chart for Zoompass Holdings is driven more by the current promotional campaign than by internal business operations and company news releases. Since the promotional campaign itself along with the stock chart closely resembles the promotional campaign and stock chart for Pura Naturals, we believe that the two will continue to act similar in the short term. For Zoompass, this could mean an imminent collapse of 56% in the short term.

96.     Furthermore, the Seeking Alpha Exposé revealed that a reference to "Robert Lee" was made in Pura's Form 8-K filed on July 26, 2016, and a Reuters company profile named "Robert Lee" as a Director of Pura. These were preliminary indicators that the "Robert Lee" connected to Pura was the same person as the "Robert Lee" that is the CEO of Zoompass. The Seeking Alpha Exposé thus stated in pertinent part:

**Zoompass & Pura Naturals: More Connections Between The Two**
In addition to the resemblances between the stock promotion campaigns subjected to

31

Zoompass and Pura Naturals, there are also internal examples that demonstrate how the companies themselves may be connected.

*Robert "Rob" Lee*

Robert "Rob" Lee has maintained the position of chief executive officer and director of Zoompass Holdings, Inc. since August 2016. In addition to previously serving as the president and CEO of a company that eventually went into receivership, Lee has "focused on the financing and restructuring of various private entities":

> Rob Lee, Director and Chief Executive Officer:  Since 2014, Mr. Lee has served as the Chief Executive Officer and Director of a private financial technology company.  He has previously served as the President and CEO of various companies including Versatech Group Inc., a company listed on the NASDAQ and Toronto Stock Exchange up until the late 1990's.  Since that time Mr. Lee has focussed on the financing and restructuring of various private entities in a wide variety of industries including manufacturing, construction, mining and retail.

One career endeavor apparently missing from Robert Lee's bio involves an obscure reference to Lee within a share exchange agreement related to Pura Naturals, Inc. found in a Form 8-K filed on July 26, 2016:

> **Item 1.01 Entry into a Material Definitive Agreement.**
>
> *Share Exchange Agreement*
>
> Effective July 18, 2016 (the "Closing Date"), Yummy Flies, Inc. (the "Company") entered into that certain Share Exchange Agreement (the "Share Exchange Agreement") by and among the Company, Pura Naturals, Inc., a Delaware corporation ("PURA") and certain shareholders of PURA (the "PURA Shareholders").  Pursuant to the Share Exchange Agreement, the Company agreed to exchange the outstanding common and preferred stock of PURA held by the PURA Shareholders for shares of common stock of the Company on approximately a 1:4.2 basis, (after giving effect to certain share cancellations).  At the Closing Date, Robert Lee, the holder of 8,289,000 shares of common stock, agreed to cancelation of such shares.  Other than Robert Lee, shareholders of Company common stock held approximately 1,926,000 shares.  Also on the Closing Date, the Company issued approximately 6,267,000 shares of common stock to the PURA shareholders.  In addition, shares issuable under outstanding options of PURA will be exercisable into shares of common stock of the Company, pursuant to the terms of such instruments.  The shares of PURA common stock issuable upon exercise of options will be exchanged for approximately 470,000 Shares of the Company's common stock, par value $0.001 per share.  As of the date of the filing of this Current Report on Form 8-K, the holders of the majority shares of common of PURA have exchanged their shares into a majority of the shares of the issued and outstanding shares of the Company's common stock.

Although we have been unable to reach a representative of Zoompass to clarify Robert Lee's full involvement with Pura Naturals, Inc., a Reuters company profile page lists Robert Lee as being appointed as a director to Pura Naturals in April 2016:

> Robert Lee    Mr. Robert Lee is a Director of the Company. Mr. Lee was appointed director in April, 2016. Mr. Lee is an experienced manager and has been the CEO of Paymobile, Inc. since 2014. Previously, he was the CEO of Global Connections Mining from 2010-2012, and concurrently the CEO of Northern Supply, Inc. from 2010-2014 and a partner of Tango Wireless from 2010-2011. From 2000-2007, Mr. Lee was the CEO of Versatech Industries.

In fact, we believe there is a possibility that Robert Lee may in fact also be the chief executive officer of Pura Natural, Inc. under the name Robert Doherty.

Verified Shareholder Derivative Complaint

97.     The Seeking Alpha Exposé also reported a "smoking gun" revelation regarding the connection between Zoompass and Pura: that Defendant Lee, listed under the name "Robert Doherty," may be the CEO of Pura. A person by the name of "Robert Doherty" is also listed on Zoompass's 2016 10-K seemingly mistakenly as the Company's Director and Chief Executive Officer. This revelation only emphasizes the fact that Defendant Lee, and all of the Individual Defendants, were involved in promulgating a promotional scheme that was in breach of their fiduciary duties to investors. The Seeking Alpha Exposé thus stated in pertinent part:

*Obscure Executive Officer Listed In Zoompass's Annual Report*

Smoking gun evidence connecting Zoompass to Pura Naturals can be seen on page 24 of ZPAS's most recent Annual Report filed on April 24, 2017. In the list of executive officers section, "Robert Doherty" is listed as director and chief executive officer of Zoompass Holdings:

As of December 31, 2016, there were four Named Executive Officers are set forth below:

| Name | Position |
|---|---|
| Robert Doherty | Chief Executive Officer, and Director |
| Steve Roberts | President and Director |
| Edward (Ted) Yew | Secretary and Director |
| Brian Morales | Chief Financial Officer |

Robert Doherty also happens to be listed as the chief executive officer for Pura Naturals, Inc. in the company's most recent Annual Report:

**Directors and Executive Officers**

The following table sets forth the names, ages and positions held with respect to each Director and Executive Officer of the Company as of the date of this Annual Report.

| Name | Age | Position | Director Since |
|---|---|---|---|
| Robert Doherty | 56 | Chief Executive Officer and Chairperson of the Board | 2016 |
| Robert Switzer | 53 | Corporate Secretary and Director | 2016 |
| James Kordenbrock [(1)] | 54 | Chief Executive Officer and Director | 2016 |

Either there was a highly unusual typo in the Zoompass annual report that mistakenly

Verified Shareholder Derivative Complaint

listed Pura Naturals CEO as its own or Robert Lee and Robert Doherty may be the same individual. According to a Bloomberg biography, the chief executive officer for Zoompass Holdings, Inc. is Robert Doherty Lee.

If Robert Doherty Lee is serving dual roles as both the chief executive officer of Zoompass Holdings, Inc. and Pura Naturals, Inc., we believe that investors should remain highly suspicious of the failure to disclose this relevant information in the SEC filings.

98.　　Following the publication of the Seeking Alpha Exposé, the price of Zoompass common stock fell $0.65 per share, or over 23%, to close at $2.25 per share on May 25, 2017, on unusually heavy trading volume.

## SUMMARY OF THE INDIVIDUAL DEFENDANTS' MISCONDUCT

99.　　The Individual Defendants' statements referenced above in ¶¶ 79-82, 84-85, and 87-89 were materially false and misleading as the statements failed to disclose material adverse facts about the Company's operations, business, and prospects. In breach of their fiduciary duties, the Individual Defendants knowingly or recklessly personally made and/or caused the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose: (1) their engagement in the Fraudulent Misconduct; and (2) that they failed to maintain adequate internal controls. As a result, Defendants' public statements were materially false and misleading at all relevant times and caused an artificial inflation of Zoompass's stock price.

100.　　The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

101.　　Moreover, the Individual Defendants breached their fiduciary duties by failing to maintain adequate internal controls.

34

102.    Furthermore, in breach of their fiduciary duties, the Individual Defendants engaged in the Fraudulent Misconduct.

### DAMAGES TO ZOOMPASS

103.    As a direct and proximate result of the Individual Defendants' conduct, Zoompass will lose and expend many millions of dollars.

104.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and Defendants Lee and Morales, amounts paid to outside lawyers, accountants, and investigators in connection thereto, and losses of revenues caused by customers' loss of trust in the Company's business and products.

105.    Such costs include nearly $2 million dollars paid to the stock promotors, despite that the stock promotion scheme provided no benefit to the Company.

106.    Such costs include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

107.    As a direct and proximate result of the Individual Defendants' conduct, Zoompass has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

### DERIVATIVE ALLEGATIONS

108.    Plaintiff brings this action derivatively and for the benefit of Zoompass to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors, officers and/or controlling shareholders of Zoompass and unjust enrichment, as well as the aiding and abetting thereof.

109.    Zoompass is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

35

110.    Plaintiff is, and at all relevant times has been, a Zoompass shareholder.  Plaintiff will adequately and fairly represent the interests of Zoompass in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

111.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

112.    A pre-suit demand on the Board of Zoompass is futile and, therefore, excused.  At the time of filing of this action, the Board consists of the following four Individual Defendants: Lee, Roberts, Yew, and Tondeur (collectively, the "Directors").  Plaintiff only needs to allege demand futility as to two of the four Directors that are on the Board at the time this action is commenced.

113.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the Fraudulent Misconduct and the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make the false and misleading statements and omissions of material fact, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

114.    Demand in this case is also excused because of Defendant Lee's controlling interest in Zoompass stock. Defendant Lee is primarily responsible for the false and misleading statements that were made by the Individual Defendants during the Relevant Period, and faces substantial liability as a result. As a significant shareholder and owner of 38.1% of the Company's common stock, he is the Company's largest individual shareholder. Therefore, due to his control position within the Company and significant shareholder status, it would be futile to expect the remaining

Verified Shareholder Derivative Complaint

Directors, particularly the non-independent directors Defendants Roberts and Yew, to consider a demand that would imperil their own positions within the Company.

115.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in the scheme to use corporate assets to manipulate the price and trading volume of Zoompass's stock and to make and/or cause the Company to make the materially false and misleading statements alleged herein.  The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors, and has subjected the company to potential criminal sanctions and heightened regulatory scrutiny as a result of the discovery of their scheme.  As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

116.    Additional reasons that demand on Defendant Lee is futile follow.  Defendant Lee is has served as a Company director and CEO of the Company since August 2016.  Defendant Lee received lavish compensation from the Company, including $349,923 in 2016.  He is thus, as the company admits, a non-independent director.  Defendant Lee conducted little, if any, oversight of the Company's engagement in the Fraudulent Misconduct and scheme to make false and misleading statements, internal controls over public reporting, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Defendant Lee was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the 2016 10-K, the 1Q 2017 10-Q, the May 9, 2017 Press Release and the May 11, 2017 Press Release, most of which he either signed or made statements in.  Also, Defendant Lee's position as a "significant shareholder" of the Company, with a large Company stock holding of 38.1% of the Company's issued and outstanding shares as of April 18, 2017 that is worth over $31.3 million reveals his interest in keeping the Company's stock price as high as possible.  Moreover, Lee was granted 537,500 shares of the

Common Stock Options, furthering his interest in keeping the Company's stock price as high as possible. As the largest individual shareholder of the Company, he is in control of the Directors and the Company itself. Moreover, Defendant Lee is a named defendant in the Securities Class Action. Thus, for these reasons, too, Defendant Lee breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

117.    Additional reasons that demand on Defendant Roberts is futile follow. Defendant Roberts has served as a Company director and President of the Company since August 2016. Defendant Roberts received lavish compensation from the Company, including $284,032 in 2016. He is thus, as the company admits, a non-independent director. He is beholden to Defendant Lee, who controls the Company, and thus dependent on Defendant Lee for his subsistence. Therefore, Defendant Roberts's position within the Company would be imperiled should he take action against Defendant Lee as a result of accepting a shareholder demand. In other words, because Defendant Lee is clearly disinterested and Defendant Roberts is dependent on Defendant Lee, demand on Defendant Roberts is futile. As a trusted Director and President of the Company, Defendant Roberts conducted little, if any, oversight of the Company's engagement in the Fraudulent Misconduct and scheme to make false and misleading statements, internal controls over public reporting, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets, and he personally made the false statements in the 2016 10-K, which Defendant Tondeur signed on his behalf. His large Company stock holding, worth about $1.18 million during the Relevant Period, reveals his interest in keeping the Company's stock price as high as possible. Moreover, Roberts was granted 537,500 shares of the Common Stock Options, furthering his interest in keeping the Company's stock price as high as possible. Thus, for these reasons, too, Defendant Roberts breached his fiduciary duties, faces a

Verified Shareholder Derivative Complaint

substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

118.    Additional reasons that demand on Defendant Yew is futile follow.  Defendant Yew has served a Company director and as the Company Secretary since August 2016.  As the company admits, he is a non-independent director.  He is beholden to Defendant Lee, who controls the Company, and thus dependent on Defendant Lee for his subsistence. Therefore, Defendant Yew's position within the Company would be imperiled should he take action against Defendant Lee as a result of accepting a shareholder demand. In other words, because Defendant Lee is clearly disinterested and Defendant Yew is dependent on Defendant Lee, demand on Defendant Roberts is futile. As a Director and Secretary of the Company, Defendant Yew conducted little, if any, oversight of the Company's engagement in the Fraudulent Misconduct and scheme to make false and misleading statements, internal controls over public reporting, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets, and he personally made the false statements in the 2016 10-K, which Defendant Tondeur signed on his behalf.  His large Company stock holding, at 12.2% of the Company's common stock that was worth over $10 million during the Relevant Period, reveals his interest in keeping the Company's stock price as high as possible.   Together with Defendant Lee, who owned 38.1% of the Company during the Relevant Period, Defendants Yew and Lee own more than 50% of Zoompass's stock and therefore assert control over the Company. Thus, for these reasons, too, Defendant Yew breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

119.    Additional reasons that demand on Defendant Tondeur is futile follow.  Defendant Tondeur has served as a Company director since August 2016. As a trusted Director, Defendant Tondeur conducted little, if any, oversight of the Company's engagement in the Fraudulent

39

Misconduct and scheme to make false and misleading statements, internal controls over public reporting, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets, and he personally made the false statements in the 2016 10-K, which Defendant Tondeur signed. His large Company stock holding, worth over $2.63 million during the Relevant Period, reveals his interest in keeping the Company's stock price as high as possible. Moreover, Tondeur was granted 187,500 shares of the Common Stock Options, furthering his interest in keeping the Company's stock price as high as possible. Thus, for these reasons, too, Defendant Tondeur breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

120.    Additional reasons that demand on the Board is futile follow.

121.    Demand in this case is excused because the Directors, who are named as defendants in this action, control the Company and are beholden to each other. The Directors and Officers of the Company collectively own 62.7% of the common stock, which gives them control of the Company over the remaining shareholders, the largest of which holds only 7.5% of the Company's common stock.

122.    Defendants Lee, Roberts, and Yew, as executive officers of the Company, were part of the Company's Long-Term Incentive plan, which provided executive officers with incentives to improve shareholder value and contribute to the success of the Company. The Long-Term Incentive, and the Common Stock Options granted under it, significantly increased the Company's executives' incentive to inflate the price of the Company's stock and thus engage in the Fraudulent Misconduct. Thus, demand as to Defendants Lee, Roberts, and Yew is futile, and excused.

123.    Members of the Board have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in

Verified Shareholder Derivative Complaint

the best interests of the Company and the shareholders. These conflicts of interest precluded the Board from adequately monitoring the Company's operations and calling into question the Individual Defendants' conduct. Thus, any demand on these Directors would be futile.

124.    Zoompass has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Zoompass any part of the damages Zoompass suffered, and will continue to suffer, thereby. Thus, any demand on the Directors would be futile.

125.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

126.    The acts complained of herein constitute violations of fiduciary duties owed by Zoompass's officers and directors, and these acts are incapable of ratification.

127.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Zoompass. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-

41

versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Zoompass, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

128. If there is no directors' and officers' liability insurance, then the Directors will not cause Zoompass to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

129. Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least two of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

130. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

131. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Zoompass's business and affairs.

132. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

133. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Zoompass.

Verified Shareholder Derivative Complaint

134.    In breach of their fiduciary duties, the Individual Defendants knowingly or recklessly personally made and/or caused the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, and prospects.  Specifically, the Individual Defendants made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose: (1) their engagement in the Fraudulent Misconduct; and (2) that they failed to maintain adequate internal controls.  As a result, Defendants' public statements were materially false and misleading at all relevant times, and caused an artificial inflation of Zoompass's stock price.

135.    The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

136.    The Individual Defendants also breached their fiduciary duties by failing to maintain adequate internal controls.

137.    Also in breach of their fiduciary duties, the Individual Defendants engaged in the Fraudulent Misconduct.

138.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and they failed to correct the Company's public statements and representations.  The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Zoompass's securities.

139.    The Individual Defendants had actual or constructive knowledge that they had mismanaged the Company and caused the Company to engage in the schemes to engage in the

Fraudulent Misconduct, to issue false and misleading statements, and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Zoompass's securities.

140.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

141.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Zoompass has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

142.    Plaintiff on behalf of Zoompass has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Abuse of Control

143.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

144.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Zoompass, for which they are legally responsible.

145.    As a direct and proximate result of the Individual Defendants' abuse of control, Zoompass has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty by, among other things, making and causing the Company to make the false and misleading statements mentioned herein and engaging in and causing the Company to engage in the Fraudulent Misconduct, Zoompass

has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

146.    Plaintiff on behalf of Zoompass has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants for Gross Mismanagement**

147.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

148.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Zoompass in a manner consistent with the operations of a publicly-held corporation.

149.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Zoompass has sustained and will continue to sustain significant damages.

150.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

151.    Plaintiff, on behalf of Zoompass, has no adequate remedy at law.

### FOURTH CLAIM

**Against Individual Defendants for Unjust Enrichment**

152.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

153.    By their wrongful acts and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Zoompass.

Verified Shareholder Derivative Complaint

154.    The Individual Defendants either benefitted financially from the improper conduct and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Zoompass that was tied to the performance or artificially inflated valuation of Zoompass, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct and breach of fiduciary duties.

155.    Plaintiff, as a shareholder and a representative of Zoompass, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits -- including from benefits and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

156.    Plaintiff on behalf of Zoompass has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

157.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

158.    The Individual Defendants caused the Company to wastefully pay nearly $2 million in a fraudulent stock promotion scheme.

159.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Individual Defendants have caused Zoompass to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend and remedy unlawful actions, and to lose business from customers who no longer trust the Company and its products.

160.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

161.    Plaintiff on behalf of Zoompass has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Zoompass, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Zoompass;

(c)    Determining and awarding to Zoompass the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Zoompass and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Zoompass and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.    a provision to permit the shareholders of Zoompass to nominate at least two candidates for election to the Board; and

3.    a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

47

(e)    Awarding Zoompass restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 26, 2017                    Respectfully submitted,

LEVERTY & ASSOCIATES LAW CHTD.

Patrick R. Leverty, Esq.
Reno Gould House
832 Willow Street
Reno, NV 89502
Telephone: (775) 322-6636
Facsimile: (775) 322-3953
Email: pat@levertylaw.com

*Liaison Counsel for Plaintiff*

THE BROWN LAW FIRM, P.C.
Timothy W. Brown, Esq.
240 Townsend Square
Oyster Bay, New York 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

48

Verified Shareholder Derivative Complaint

## VERIFICATION

I, Airick Johnson, am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 21 day of July, 2017.

_Airick Johnson_
Airick Johnson

EXHIBIT B

Electronically Filed
11/22/2017 10:41 AM
Steven D. Grierson
CLERK OF THE COURT

**STIP**
Pat Lundvall (NVSBN 3761)
McDonald Carano LLP
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Tel: (702) 873-4100
plundvall@mcdonaldcarano.com

James V. Masella, III
Jesse A. Townsend
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
Telephone: (212) 336-2000
jmasella@pbwt.com
jtowsend@pbwt.com

*Attorneys for Defendants Robert Lee, Steve Roberts, Edward Yew, Brian Morales, and Jon Tondeur and Nominal Defendant Zoompass Holdings, Inc.*

DISTRICT COURT

CLARK COUNTY NEVADA

| | |
|---|---|
| AIRICK JOHNSON, derivatively and on behalf of ZOOMPASS HOLDINGS, INC., <br><br> Plaintiff, <br><br> v. <br><br> ROBERT LEE, STEVE ROBERTS, EDWARD YEW, BRIAN MORALES, AND JON TONDEUR, <br><br> Defendants, <br><br> and <br><br> ZOOMPASS HOLDINGS, INC. <br><br> Nominal Defendant. | Case No.  A-17-759099-C <br><br> Dept. No.:  2 <br><br> **STIPULATION CONCERNING SERVICE OF PROCESS AND STAYING PROCEEDINGS** |

WHEREAS Plaintiff Airick Johnson filed his Complaint on July 26, 2017 in which he

alleged, among other things, breaches of fiduciary duty, corporate waste, gross mismanagement,

- 1 -

10132280v.1

unjust enrichment, and waste of corporate assets derivatively on behalf of Nominal Defendant

Zoompass Holdings, Inc. (the "Nominal Defendant") against Defendants Robert Lee, Steve

Roberts, Edward Yew, Brian Morales, and Jon Tondeur, (collectively, the "Individual

Defendants," and together with the Nominal Defendant, the "Defendants");

WHEREAS pending before the United States District Court for the District of New

Jersey is *Patel v. Zoompass Holdings, Inc.*, 2:17-cv-03831 (the "Securities Class Action"), a

putative class action alleging violations of the Securities Exchange Act of 1934 and regulations

promulgated thereunder;

WHEREAS the parties to the Securities Class Action have stipulated that the plaintiff

shall file an Amended Complaint on or before November 20, 2017 and that the defendants shall

answer, move, or otherwise respond to said Amended Complaint on or before 60 days from the

filing of the Amended Complaint;

WHEREAS Plaintiff's Complaint in the above-captioned matter alleges certain

misconduct that is similar to the misconduct alleged in the Securities Class Action; and

WHEREAS Plaintiff, the Individual Defendants, and the Nominal Defendant wish to

promote the efficient and orderly administration of justice by coordinating this derivative action

with the Securities Class Action.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and between

the undersigned counsel for the Plaintiff, the Individual Defendants, and the Nominal Defendant

pursuant to Rule 16 of the Rules of the District Courts of the State of Nevada that:

(1)     The undersigned counsel for the Individual Defendants hereby accept service of

the Complaint filed in the above-captioned matter on behalf of all Defendants,

including the Individual Defendants who have not been served previously, as of

the date set forth below;

- 2 -

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

(2)  By authorizing their counsel to accept service on their behalf, the Individual Defendants waive any and all objections to the absence of a summons or of service, but do not waive any other defense, objection, or ground for dismissal that they may have otherwise raised in response to this action, including but not limited to any objection to the Court's jurisdiction or venue of the action.

(3)  All activity in the above-captioned matter shall be stayed, and the Defendants need not answer, move, or otherwise respond to Plaintiff's Complaint, or any amended complaint, during the pendency of the stay;

(4)  Should any of the Defendants produce during the pendency of the stay any documents to any plaintiffs in the Securities Class Action, to any plaintiffs in any related derivative actions, or to any purported shareholders who made a books and records demand, Defendants will produce to Plaintiff a copy of the same documents, subject to the parties entering into a confidentiality agreement and/or protective order;

(5)  During the pendency of the stay, Defendants shall include Plaintiff in any mediation and any formal settlement talks with the plaintiffs in the Securities Class Action and shall include Plaintiff in any mediation and any formal settlement talks with any plaintiff in any related derivative lawsuit;

(6)  Plaintiff may lift the stay of the above-captioned matter at any time by (i) making a request to the Court, and (ii) by transmitting notice to counsel for the nominal defendant via e-mail at the e-mail addresses listed below;

(7)  Defendants shall promptly notify Plaintiff of any related derivative lawsuits that any of them become aware of;

(8)  During the pendency of the stay, Plaintiff may amend the Complaint;

- 3 -

10132280v.1

(9)     The Individual Defendants and the Nominal Defendant shall answer, move, or otherwise respond to Plaintiff's Complaint, or instead the operative amended complaint, if any amended complaint has been filed, within sixty (60) days after they receive a request to lift the stay, except as described in Paragraph 11, *infra*;

(10)    Should any other derivative case be filed in any forum subsequent to the above-captioned matter that alleges and seeks relief from the same or similar alleged misconduct as that alleged in the above-captioned matter, the Individual Defendants and the Nominal Defendant shall either agree to, or move for, a stay of said later-filed action;

(11)    Should a later-filed action such as is described in Paragraph 10, *supra*, not be stayed, Plaintiff in the above-captioned matter may lift the stay of the above-captioned matter by following the requirements of Paragraph 6, *supra*, but in such circumstance the Individual Defendants and the Nominal Defendant shall answer, move, or otherwise respond to Plaintiff's Complaint, or instead the operative amended complaint, if any amended complaint has been filed, within twenty (20) days after they receive a request to lift the stay; and

(12)    Should any other derivative case be filed in any forum that alleges and seeks relief from the same or similar alleged misconduct as that alleged in the above-captioned matter, the Individual Defendants and the Nominal Defendant shall never move to stay the above-captioned action in deference to the later-filed action.

(13)    Counsel for the Individual Defendants and the Nominal Defendant have advised counsel for Plaintiff that they intend to remove the above-captioned matter to the United States District Court for the District of Nevada ("Federal Court"), and

- 4 -

counsel for Plaintiff has consented to same.

(14)    In consideration for receipt of Plaintiff's consent to remove the above-captioned action to Federal Court, Defendants shall enter into a stipulation in the Federal Court that includes, and be bound to act in accord with, Paragraphs 2-12, *supra*, in the event that the above-captioned matter is removed to Federal Court; and

(15)    Should this case be remanded, nothing in this agreement shall constitute a waiver of parties' right to request a transfer of this case to the Business Court pursuant to Rule 1.61 of the Rules of Practice For the Eighth Judicial District Court of the State of Nevada.

Dated: November 22, 2017

MCDONALD CARANO, LLP

By: _____
Pat Lundvall (NVSBN 3761)
McDonald Carano LLP
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Tel: 702-873-4100
plundvall@mcdonaldcarano.com

PATTERSON BELKNAP WEBB & TYLER LLP
James V. Masella, III
Jesse A. Townsend
1133 Avenue of the Americas
New York, New York 10036
Tel: (212) 336-2000
jmasella@pbwt.com
jtownsend@pbwt.com

*Attorneys for Defendants Robert Lee, Steve Roberts, Edward Yew, Brian Morales, and Jon Tondeur and for Nominal Defendant Zoompass Holdings, Inc.*

- 5 -

10132280v.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

LEVERTY & ASSOCIATES LAW CHTD.

By: _____
Patrick R. Leverty, Esq.
Reno Gould House
832 Willow Street
Reno, Nevada 89502
Tel:   (775) 322-6636
pat@levertylaw.com

*Liaison Counsel for Plaintiff*

THE BROWN LAW FIRM, P.C.
Timothy W. Brown, Esq.
240 Townsend Square
Oyster Bay, New York 11771
Tel:  (516) 922-5427
tbrown@thebrownlawfirm.net

*Attorneys for Plaintiff*

STIPULATION CONCERNING SERVICE OF PROCESS AND STAYING PROCEEDINGS
10132280v.1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I am an employee of McDonald Carano LLP, and that on the 22nd day of November, 2017, I served a true and correct copy of the STIPULATION CONCERNING SERVICE OF PROCESS AND STAYING PROCEEDINGS via United States Mail as follows:

Patrick R. Leverty, Esq.
Reno Gould House
832 Willow Street
Reno, Nevada 89502

Timothy W. Brown, Esq.
240 Townsend Square
Oyster Bay, New York 11771

/s/ Beau Nelson
An employee of McDonald Carano, LLP

- 7 -

10132280v.1